**Dearal STASS, Plaintiff-Appellant,**

v.

**AMERICAN COMMERCIAL LINES, INC. and the BARGE "ACBL–920", Defendants-Appellees.**

No. 80–3704
Summary Calendar.

United States Court of Appeals, Fifth Circuit.

Dec. 9, 1983.

Rehearing and Rehearing En Banc Denied Jan. 19, 1984.

---

Kenneth B. Krobert, Chalmette, La., for plaintiff-appellant.

Jones, Walker, Waechter, Poitevent, Carrere & Denegre, Robert M. Contois, Jr., New Orleans, La., for defendants-appellees.

Before BROWN, POLITZ and WILLIAMS, Circuit Judges.

JOHN R. BROWN, Circuit Judge:

An injured longshoreman must navigate the channels of the LHWCA before he can drop anchor in the vessel owner's pocketbook and claim his booty.[1]

Now over a dozen years ago, Amendments to the Longshoremen's and Harbor Workers' Compensation Act (LHWCA) beached the skow UNSEAWORTHINESS, built by *Sieracki*,[2] to launch a new vessel for longshoreman recovery—the clipper REASONABLE CARE. Able crafters though they were, the Shipbuilders of Capitol Hill were unwilling to venture out on the waters of tort law, and left the REASONABLE CARE adrift in the doldrums of vagueness, its destiny in the steady hands of its nine Supreme Pilots and its energetic (but rarely cohesive) Circuit and District Crew. "Through the straits of *De Los Santos*,"[3] was the Pilots' terse command. Once again, a Crew of the Fifth will try mightily to obey.

---

1. *Lemon v. Bank Lines, Ltd.*, 656 F.2d 110, 113 (5th Cir.1981) (Goldberg, J.).

2. *Seas Shipping Co. v. Sieracki*, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099 (1946).

3. *Scindia Steam Navigation Co. v. De Los Santos*, 451 U.S. 156, 101 S.Ct. 1614, 68 L.Ed.2d 1 (1981).

## I.

Dearal M. Stass, the plaintiff-appellant, is a first class shipfitter for Louisiana Dock Company in Harahan, Louisiana. He repairs barges.[4]

On December 27, 1977, the Barge ACBL–920 (Barge 920), a standard inland hopper barge owned by American Commercial Lines (ACL), the defendant, was turned over to Louisiana Dock for repairs mainly of the hull and the approximately four sets of grain doors on each side of the slightly-peaked topside of the barge. By January 16, 1978, the work was finished, including the repairs on several of the grain doors. Work records indicate that Barge 920 was also partially cleaned, a service Louisiana Dock routinely performed as it deemed necessary.

On January 11, 1978, about 15 days after Barge 920 was delivered by ACL, Stass was assigned to open the sets of grain doors to check each set's rain seals for damage. In boarding Barge 920 and in opening the first set of grain doors, Stass noticed sprouted soybean or other grain scattered in the damp areas around the barge top and covers, a condition he figured at trial occurred on about half the barges he worked. Although the sprouts made for slippery footing, the work continued. By about 10:00 a.m., Stass, standing on the peak or top of the barge, and his tacker, Lawrence L. Goins, standing on the lower edge of the barge, had already opened two sets of doors without problem.

The third set of grain doors—opposite a set Stass and Goins had just opened—did not open easily, and Stass called another fitter to give him and Goins a hand. On the second try, with Goins and the fitter at the lower end of the covers and Stass again by himself on the 18-inch peaked walkway at the top (and with his back to the previously-opened hatch), the door lifted up about two or three feet but no more. Then, the three shipyard workers let the door drop back down, Stass slipped on something on the cover—"probably soy beans," lost his balance backwards, and fell through the open hatch about 14 to 16 feet to the floor of the empty barge. He landed on his heels and tailbone and suffered serious injuries.

Stass sued ACL under § 905(b) of the LHWCA.[5] The Trial Judge found that though the slippery sprouted grain was on Barge 920 and around the covers before Stass boarded, the existence of the grain was known to Stass, and thus Louisiana Dock, or should have been obvious to or anticipated by it. Further, the Judge held that no defect was ever shown in the grain door which failed to fully open, and, anyway, Stass testified that his fall was not caused by the dropping of the door. Finally, even if the door was defective, there was no requirement under § 905(b) to fix the doors before turning the barge over to Louisiana Dock for inspection and repair of, among other things, the grain doors.[6]

4. The shipfitter in a repair crew cuts out the damaged metal on a vessel and replaces it with a fitted new piece of metal. The tacker, often a less-experienced welder, "tacks" it up—spot welds the new sheet of metal into place, and a welder follows and fully welds the sheet unto the vessel.

5. 33 U.S.C.A. § 905(b) provides in relevant part:
   In the event of injury to a person covered under this chapter caused by the negligence of a vessel, then such person, or anyone otherwise entitled to recover damages by reason thereof, may bring an action against such vessel as a third party in accordance with the provisions of section 933 of this title, and the employer shall not be liable to the vessel for such damages directly or indirectly and any agreements or warranties to the contrary shall be void.... The liability of the vessel under this subsection shall not be based upon the warranty of seaworthiness or a breach thereof at the time the injury occurred. The remedy provided in this subsection shall be exclusive of all other remedies against the vessel except remedies available under this chapter.

6. This appeal marks the fourth appearance of this case before this Court. Twice we remanded for specific findings as to why Stass' notice of appeal was not timely filed and whether it was due to excusable neglect. The District Court found that his appeal was filed in time and that if there was any delay it was excusable. Most recently we remanded for reconsideration in light of *De Los Santos, supra, Wild v. Lykes Bros. Steamship Corp.*, 665 F.2d 519 (5th Cir.1981), and *Lemon v. Bank Lines, Ltd.*, 656

## II.

In *Scindia Steam Navigation Co. v. De Los Santos,* 451 U.S. 156, 101 S.Ct. 1614, 68 L.Ed.2d 1 (1981), the Supreme Court outlined the duties a shipowner owes to a contracting stevedore and its longshoremen.[7]

(i) Before the loading or unloading begins, the shipowner must at least exercise "ordinary care under the circumstances to have the ship and its equipment in such condition that an expert and experienced stevedore will be able by the exercise of reasonable care to carry on its cargo operations with reasonable safety." The shipowner may rely on the stevedore to perform its work with reasonable care, but must warn the stevedore of "any hazards on the ship or with respect to its equipment that are known to the vessel or should be known to it in the exercise of reasonable care, that would likely be encountered by the stevedore in the course of his cargo operations and that are not known to the stevedore and would not be obvious to or anticipated by him if reasonably competent in the performance of his work." 451 U.S. at 166–67; 101 S.Ct. at 1622.

(ii) Once the work starts, the shipowner has no general duty to monitor the stevedoring operation, "absent contract provision, positive law, or custom to the contrary," and it may rely on the stevedore's judgment that equipment is reasonably safe for continued use during the work. "The shipowner, within limits, *is* entitled to rely on the stevedore, and owes no duty to the longshoremen to inspect or supervise the cargo operations." *Id.* at 172, 101 S.Ct. at 1624 (original emphasis).

(iii) However, the shipowner is entitled to rely on the stevedore's judgment only until the shipowner becomes aware of a hazard on the ship and that the stevedore is unreasonably failing to protect the longshoremen against that hazard, at which time it has a

"duty to intervene" and remedy the hazard. Although the shipowner is deemed to know about hazards existing before the work begins, it must have actual knowledge of hazards which develop during the operations. *Id.* at 175–76, 101 S.Ct. at 1626.

Under the "new regime" of *De Los Santos, Hill v. Texaco, Inc.,* 674 F.2d at 447, 449 n. 2, the shipowner has no defense that the hazard was so "open and obvious" to the longshoreman that he either was contributorily negligent or assumed the risk of the hazard by continuing to work. *De Los Santos,* 451 U.S. at 176 n. 22, 101 S.Ct. at 1626 n. 22; *Hill,* 674 F.2d at 452 n. 5; *Lemon v. Bank Lines, Ltd.,* 656 F.2d 110, 114 (5th Cir.1981). This is so because when faced with an openly dangerous shipboard condition, the longshoreman's "only alternatives would be to leave his job or face trouble for delaying the work." *Napoli v. Hellenic Lines, Ltd.,* 536 F.2d 505, 509 (2d Cir.1976) *cited in De Los Santos,* 451 U.S. at 176 n. 22, 101 S.Ct. at 1626 n. 22. In short, "a longshoreman's own knowledge of a shipboard hazard will not negate a shipowner's duty of care which would exist otherwise." Comment, 56 Tul.L.Rev. 1421, 1432 (1982).

In the context of repair operations, however, a vessel owner's duty to the shipyard and its workers is subtly altered. The courts have long recognized that the vessel owner has no duty to deliver his ship to the shipyard in a hazard-free condition, when the requested repairs would remedy the hazards which cause the injury. · *See, e.g., West v. United States,* 361 U.S. 118, 80 S.Ct. 189, 4 L.Ed.2d 161 (1959). In *West,* the vessel owner had no duty to tighten the plugs in the ship's water system, one of which shot off when the water was turned on and injured the plaintiff-employee:

It appears manifestly unfair to apply the requirements of a safe place to work to

F.2d 110 (5th Cir.1981), and instructed the Court to make the appropriate findings of law and fact. *Stass v. American Commercial Lines, Inc.,* 683 F.2d 120 (5th Cir.1982). On remand, the Trial Judge allowed limited new evidence, again found for ACL, and made the appropriate findings.

**7.** Shipowners hire stevedores to load and unload cargo; stevedores hire longshoremen to do the work.

the shipowner when he has no control over the ship or the repairs, and the work of repair in effect creates the danger which makes the place unsafe. The [shipowner], having hired [the shipyard] to perform the overhaul and reconditioning of the vessel—including the testing—was under no duty to protect petitioner from risks that were inherent in the carrying out of the contract.

*Id.* at 123, 80 S.Ct. at 193; *see also Hess v. Upper Mississippi Towing Corp.,* 559 F.2d 1030, 1036 (5th Cir.1977) (no duty of vessel owner to "free" its barge of gasoline vapors when the "precise reason for plaintiff's employment was to make [that] unsafe condition safe"), *cert. denied* 435 U.S. 924, 98 S.Ct. 1489, 55 L.Ed.2d 518 (1978).

After *De Los Santos,* this Court has continued to recognize these principles in a shipyard situation. In *Duplantis v. Zigler Shipyards,* 692 F.2d 372 (5th Cir.1982), we refused to impose a duty on the shipowner to free its barge of highly-explosive gas from a cargo of light crude oil prior to delivering the barge to a shipyard to have a leak in the hull repaired. Since gas-freeing the barge was "a necessary first step in doing the work Zigler had undertaken," and "critical to its ability to repair the pinhole," it was "one of the 'dangers which the contractor was hired to correct,'" *Id.* at 374–75, *quoting Hess, supra,* 559 F.2d at 1033, and the vessel owner had satisfied its duties under *De Los Santos* in turning over the vessel.

In *Hill v. Texaco, Inc.,* 674 F.2d 447 (5th Cir.1982), we held that Texaco, the vessel owner, was not negligent in delivering a tanker with the walls of its gasoline storage tank damp, slippery, and caked with loose rust. Texaco had hired Evans Engineering, Inc. to determine the effect of rust on the thickness of the tank walls, and an Evans employee—the plaintiff—slipped on a piece of loose rust, fell from the metal braces on the tank wall he was examining, and suffered injuries. Since the danger of the rusted walls was "inherent in the carrying out of the contract," *Id.* at 452, *quoting West, supra,* 361 U.S. at 123, 80 S.Ct. at 193, this Court denied relief. "[A] ship may not be found negligent merely because a condition of the ship that requires repair or inspection injures the person hired to inspect or repair that condition." *Id.* at 452 n. 5. We also rejected the argument that Texaco was negligent in turning over the tank to Evans immediately after purging the tank of ballast water, even though "the damp walls of the tank exacerbated the slippery conditions." *Id.* at 452.

The tank, although wet, posed only a limited and accepted hazard to Hill until he elected to climb the rusted stiffeners without a safety line. Evans, as an expert in its field, could have brought safety lines with it or borrowed them from the ship. Had Evans done so, Hill could have completed the test with a reasonable degree of safety. *Scindia* teaches that the ship is entitled to assume that the independent contractor aboard ship will act reasonably with a view towards the safety of its employees. 101 S.Ct. at 1624. Were this not so, the LHWCA's imposition of a negligence standard rather than a seaworthiness standard on the vessel's conduct towards the harborworkers would mean nothing.

*Id.* (footnote omitted).

### III.

Stass argues that under *Scindia* ACL was obliged to use ordinary care to deliver Barge 920 in such condition that Louisiana Dock, an experienced shipyard, and its employees would have been able by the exercise of reasonable care to perform their repair work with reasonable safety. Further, ACL must have warned Louisiana Dock of any hidden dangers it knew, or should have known, existed on Barge 920. He argues though that ACL fell short of its responsibilities when it delivered Barge 920 with sprouted grain lying around the covers and with a defective grain door.

The Trial Judge found that, as a matter of routine procedure, Louisiana Dock cleans barges delivered to it for repairs if it determines such cleaning is necessary. This finding of fact, armed with the "Buckler and Shield" of F.R.Civ.P. 52(a), will not be

884

set aside unless clearly erroneous, and our perusal of the trial record finds no such error. Stass' foreman at the time of the accident stated at trial that "when a barge come[s] from maintenance [other Louisiana Dock employees], it should be clean." The then-estimator for Louisiana Dock (who wrote work orders and gave cost estimates to clients) testified about the routine procedures for cleaning barges prior to repair, about the company's special cleaning crews, and about the facts that cleaning was something Louisiana Dock would determine is necessary and charge for as done. Work records in fact indicate that cleaning was done on Barge 920 by Louisiana Dock, though in the hopper and not on the cover of the vessel.

In short, cleaning the areas to be repaired on incoming barges was, as in *Duplantis,* 692 F.2d at 375, simply "a necessary first step in doing the work," and the slippery footing caused by the sprouts was a risk "inherent in the carrying out of the contract" for repairs, *West,* 361 U.S. at 123, 80 S.Ct. at 193; *Hill,* 674 F.2d at 452. In turning over Barge 920, ACL could rely on Louisiana Dock to perform its repair job properly, *De Los Santos,* 451 U.S. at 170, 101 S.Ct. at 1623, and clean off the grain residue. Like the wet tank in *Hill,* the slippery footing on the barge cover "posed only a limited and accepted hazard," 674 F.2d at 452, to Stass until he decided to—or, more likely, was ordered to[8]—open grain doors on both sides of Barge 920. As his then-foreman testified, Louisiana Dock policy was always to open doors on only one side of a barge, close them after any inspec-

tion (or put protective stanchions and lines around the open doors that needed repairs), and then open the doors on the other side of the barge. Had Louisiana Dock required its own policy to be followed, Stass would not have been injured.

Moreover, ACL had no duty to warn Louisiana Dock about the sprouts. As the Trial Judge pointed out, Stass himself testified that 50% of the barges he worked on had such residue. At least some grain residue on a barge specially designed to carry grain could be expected by any expert and experienced shipyard.

Neither was ACL negligent in delivering the barge with, or failing to warn about, the apparently defective grain door. Again as the Trial Judge pointed out, the plaintiff expressly disclaimed the bad grain door as a cause of his fall.[9] The Court found as a fact, which we do not find clearly erroneous, that the fall was not caused by the vibration of the dropped door. Stass could just as easily have slipped and fallen closing one of the non-defective doors.

ACL had no duty to supervise or inspect Louisiana Dock's repair operations, absent as here contrary contract, law, or custom. It could rely on Louisiana Dock to avoid exposing its employees, like Stass, to unreasonable hazards. Louisiana Dock, not ACL, was obliged to erect protective "guards" around open hatches, remedy slippery footing, and require proper procedures to be followed in opening grain doors.[10]

Finally, ACL has not transgressed the *De Los Santos* requirement that the shipowner intervene to protect a longshoreman when

**8.** Stass testified to the dilemma of a longshoreman or any harborworker:

Q. Are you allowed to choose what you want to do when you are out there working?

A. No. You have no choice. You just do what your foreman tells you to do.

**9.** Stass' testimony reflects this:

So we release [the grain door] and let it drop back down, and it dropped about two or three foot. I fell over and lost my balance backwards from slipping on something that was on top of the cover.... probably soy beans, sir.

He later testified:

Q. When that door dropped, did it bounce you at all?

A. No, sir.

Q. You didn't lose your balance, the door jarring the cover you were standing on?

A. No, sir.

**10.** 29 C.F.R. § 1915.73(c) (1983) provides:

**§ 1915.73 Guarding of deck openings and edges.**

(a) The provisions of this section shall apply to ship repairing and shipbuilding operations and shall not apply to shipbreaking.

\* \* \* \* \* \*

(c) When employees are working around open hatches not protected by coamings to a

the vessel knows of an unsafe condition that the stevedore (or shipyard) is improvidently failing to guard the worker against. There is no evidence in the record that ACL had "actual knowledge"of the hazardous condition which arose—the open and unguarded hatch combined with the slippery footing. *See Helaire v. Mobil Oil Co.*, 709 F.2d 1031, 1038 (5th Cir.1983); *Duplantis*, 692 F.2d at 376; *Ducote v. International Operating Co.*, 678 F.2d 543, 546 (5th Cir. 1982); *Hill*, 674 F.2d at 451.

### IV.

So ACL, sailing with REASONABLE CARE, passes this Crew's careful watch. If only Louisiana Dock had done likewise. AFFIRMED.

height of 24 inches or around other large openings, the edge of the opening shall be guarded in the working area to height of 36 to 42 inches, except where the use of such guards is made impracticable by the work actually in progress.

Section 1915.91(b) and (c) provide:

**§ 1915.91  Housekeeping.**

The provisions of this section shall apply to ship repairing, shipbuilding and shipbreaking except that paragraphs (c) and (e) of this section do not apply to shipbreaking.

\*    \*    \*    \*    \*    \*

(b) All working areas on or immediately surrounding vessels and dry docks, graving docks, or marine railways shall be kept reasonably free of debris, and construction material shall be so piled as not to present a hazard to employees.

(c) Slippery conditions on walkways or working surfaces shall be eliminated as they occur.