Thomas Jerald WITT, Sr., Plaintiff,

v.

AMERICAN TRADING TRANSPORTA-
TION CO., INC., a Maryland corpo-
ration, et al., Defendants.

Civ. No. 91–1325–JO.

United States District Court,
D. Oregon.

May 5, 1993.

Thomas W. McPherson, Rankin Mersereau & Shannon, Portland, OR, for plaintiff.

John M. Cowden, Garvey Schubert & Barer, Portland, OR, for defendants.

## OPINION AND ORDER

ROBERT E. JONES, District Judge:

This maritime personal injury action arising under the Longshore and Harbor Workers' Compensation Act is before the court on defendants' motion for summary judgment. Also before the court is defendants' motion to strike the affidavit of Thomas J. Witt, Sr.

## SUMMARY OF FACTS

Plaintiff, a ship's superintendent employed by West State, Inc. ("WSI"), alleges he was injured while working aboard ·the CHESA-PEAKE TRADER at the Swan Island Ship Repair Yard in Portland, Oregon on July 1, 1991. Defendants own and operate the CHESAPEAKE TRADER, a tanker vessel. Defendants contracted with WSI for extensive maintenance and repair work to be conducted on the vessel in June and July of 1991. Plaintiff was WSI's superintendent in charge of the work.

In addition to the work originally contracted for, defendants decided to have WSI place Butterworth tank cleaning openings[1] in the port and starboard bunker tanks of the vessel. No work had previously been scheduled to be done in these tanks. An issue arose whether the openings would be made from inside the tank, which would require construction of staging inside the tank to permit workers to reach the underdeck area where the work was to be done, or by using a "fire bucket" or "water seal" method, whereby the area to be burned is isolated from the tank below using a bucket of water pulled tight from above to catch sparks and prevent a fire inside the tank. The staging method is considerably more expensive. Plaintiff was inspecting the interior of the port bunker tank to determine how the work was to be done when the accident occurred.

The tank's interior deck, on which the accident occurred, contains rows of small oval "lightening" holes, designed to allow the free flow of fuel oil in the tank. In addition, there is a larger, rectangular access hole in the deck, into which plaintiff fell. A heating coil,

which is a pipe set ankle high off the deck, borders the rectangular hole on two sides. (See photo attached).

When plaintiff entered the tank, it was not lighted and plaintiff used only a flashlight. Upon entering the tank, plaintiff noticed the rows of lightening holes. As he walked toward the aft end of the bunker tank, he also saw the heating coil. He stepped over the heating coil and fell into the rectangular hole to the next deck, approximately 12 to 15 feet below.

## STANDARDS

Summary judgment should be granted if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). If the moving party shows that there are no genuine issues of material fact, the nonmoving party must go beyond the pleadings and designate facts showing an issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). A scintilla of evidence, or evidence that is merely colorable or not significantly probative, does not present a genuine issue of material fact. *United Steelworker of America v. Phelps Dodge Corp.*, 865 F.2d 1539, 1542 (9th Cir.), *cert. denied*, 493 U.S. 809, 110 S.Ct. 51, 107 L.Ed.2d 20 (1989).

The substantive law governing a claim determines whether a fact is material. *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir.1987). Reasonable doubts as to the existence of a material factual issue are resolved against the moving party. *Id.* at 631. Inferences drawn from facts are viewed in the light most favorable to the nonmoving party. *Id.* at 630–31.

## DISCUSSION

*The Shipowner's Duty of Care*

Plaintiff has received benefits under the Longshore and Harbor Workers' Compensation Act (the "LHWCA"), 33 U.S.C. § 901 et seq. Compensation under the LHWCA is

---

1. "Butterworthing" is a means of cleaning tanks and the openings were to be used for equipment access from the main deck.

the employee's exclusive remedy against the employer. 33 U.S.C. § 905(a). An injured employee may, however, pursue additional damages from third parties while receiving compensation from the employer at the same time. 33 U.S.C. § 933(a). In the event of recovery against the third party, the amount of statutory compensation paid by the employer must be reimbursed. 33 U.S.C. § 933(e).

The LHWCA underwent significant amendments in 1972. Prior to the amendments, an employee pursuing a third-party action against the shipowner could recover under the doctrine of unseaworthiness, a form of strict liability, which required a showing of an unsafe, injury-causing condition on the vessel. *Seas Shipping Co. v. Sieracki*, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099 (1946). The 1972 amendments abolished the longshoreman's right to recover under the doctrine of unseaworthiness. 33 U.S.C. § 905(b). As a result, an employee must now prove negligence in order to recover from the shipowner.[2]

■ A shipowner "owes to the stevedore and his longshoremen employees the duty of exercising due care 'under the circumstances.'" *Scindia Steam Navigation Co. v. De Los Santos*, 451 U.S. 156, 166, 101 S.Ct. 1614, 1621, 68 L.Ed.2d 1 (1981). Once its vessel has been turned over to a stevedore, the longshoreman's employing contractor, the shipowner's duties become limited:

> [A]bsent contract provision, positive law, or custom to the contrary ... the shipowner has no general duty by way of supervision or inspection to exercise reasonable care to discover dangerous conditions that develop within the confines of the cargo operations that are assigned to the stevedore. The necessary consequence is that the shipowner is not liable to the longshoreman for injuries caused by dangers unknown to the owner and about which he had no duty to inform himself.... The shipowner, within limits, is entitled to rely on the stevedore, and owes no duty to the

longshoreman to inspect or supervise the cargo operations.

*Id.* at 172, 101 S.Ct. at 1624. The *Scindia* standard extends beyond cargo operations to non-longshore employees of independent contractors working aboard a vessel. *Cook v. Exxon Shipping Co.*, 762 F.2d 750, *modified*, 773 F.2d 1001 (9th Cir.1985), *cert. denied*, 475 U.S. 1047, 106 S.Ct. 1266, 89 L.Ed.2d 575 (1986).

The *Scindia* duty of due care "under the circumstances" has five distinct aspects:

> *First*, the vessel must "[exercise] ordinary care under the circumstances to have the ship and its equipment in such condition that an expert and experienced stevedore will be able by the exercise of reasonable care to carry on its cargo operations with reasonable safety to persons and property." * * * This may be described as the turnover duty of safe condition, as it relates to the condition of the vessel before it is turned over to the stevedore.

> *Second*, the vessel must "[warn] the stevedore of any hazards on the ship or with respect to its equipment that are known to the vessel or should be known to it in the exercise of reasonable care, that would likely be encountered by the stevedore in the course of his cargo operations and that are not known by the stevedore and would not be obvious to or anticipated by him if reasonably competent in the performance of his work." * * * This may be described as the turnover duty to warn.

> *Thirdly*, the vessel may be liable "if it actively involves itself in the cargo operations and negligently injures a longshoreman." * * * This may be described as the active involvement duty. And a related *fourth* duty is that the vessel may be liable "if it fails to exercise due care to avoid exposing longshoremen to harm from hazards they may encounter in areas, or from equipment, under the active control of the vessel during the stevedoring operation." * * * This may be described as the active control duty.

---

2. The 1972 amendments also abolished the shipowner's right to indemnity from the employer.

33 U.S.C. § 905(b).

*Finally,* ... a vessel is at times under a duty to intervene in the stevedore's operations and correct a dangerous condition. This duty arises when· 1) the vessel is aware of the condition, 2) the vessel should realize the condition presents an unreasonable risk of harm to the longshoreman, and 3) the vessel knows that the stevedore, as a result of an "obviously improvident" judgment, has failed to remedy the situation. * * * This may be described as the intervention duty.

*Bjaranson v. Botelho Shipping Corp., Manila,* 873 F.2d 1204, 1207 (9th Cir.1989) (quoting *Scindia,* 451 U.S. at 167, 175–76, 101 S.Ct. at 1622, 1626) (emphasis added).

### A. *Defendants' Turnover Duties*

■ In the context of repair operations, a vessel owner's turnover duties are "subtly altered." *Stass v. American Commercial Lines, Inc.,* 720 F.2d 879, 882 (5th Cir.1983). A vessel owner is not liable for dangers inherent in carrying out the repair contract. *Peters v. Titan Navigation Co.,* 857 F.2d 1342, 1344 (9th Cir.1988) (citing *Meserole v. M/V Fina Belgique,* 736 F.2d 147, 149 (5th Cir.1984)). Thus, the shipowner incurs no liability when a repairman is injured while performing "a necessary first step in doing the repair work." *Id.* In other words, the shipowner is relieved from its duty to turn the ship over in a safe condition if the repair contractor is being hired to remedy the very condition that is unsafe. *See id.; West v. United States,* 361 U.S. 118, 123, 80 S.Ct. 189, 193, 4 L.Ed.2d 161 (1959).

Defendants contend that they are not liable because plaintiff was injured while inspecting the tanks, a necessary first step in installing the Butterworth openings. It is undisputed that the decision to install the openings required inspection of the tanks, specifically the underside of the deck where the openings would be installed.

■ The repair contractor's tasks necessarily include the preparation of its work places aboard the vessel. *See Peters,* 857 F.2d at 1344–45; *Meserole,* 736 F.2d at 149; *Stass,* 720 F.2d at 884. The shipowner is not liable for injuries sustained due to the contractor's failure to prepare against risks "inherent in the carrying out of the contract." *Stass,* 720 F.2d at 884.

The *Stass* case is illustrative of this principle. In *Stass,* an employee injured after slipping on scattered grain while repairing a barge sued the owner of the barge. The trial court entered judgment in· favor of the barge owner, finding that the repair contractor, as a matter of routine procedure, cleans barges prior to repairing them if it determines such cleaning is necessary. Based on this finding, the Fifth Circuit affirmed, because

... cleaning the areas to be repaired on incoming barges was ... simply "a necessary first step in doing the work," and the slippery footing caused by the sprouts was a risk "inherent in the carrying out of the contract" for repairs.... In turning over Barge 920, [the owner] could rely on [the repair contractor] to perform its repair job properly ... and clean off the grain residue.

720 F.2d at 884 (citations omitted).

■ In this case, nothing was done to prepare the tanks for the inspection or the work to be done. If the holes had been covered or barricaded, the accident would not have occurred. If portable lighting had been brought into the tank, the holes would have been clearly visible.

Plaintiff argues that the tanks had not been prepared for plaintiff's initial entry into the tank because no work had been scheduled in the tank under the original contract and the inspection was simply part of an unscheduled oral "add on." Plaintiff's argument in this respect is weak, at best, because work clearly was contemplated in the tank as of the moment plaintiff entered the tank to inspect. Whether it was scheduled or not is irrelevant. The evidence further shows that it was plaintiff who chose not to prepare the work area for the inspection, even though the area would have been prepared prior to doing the installation work.

WSI's safety officer on the project, Bo Williams, testified at deposition that he recommended to plaintiff that lights be installed in the tank, but plaintiff declined because no work would be done in the tank. Defen-

dants' Exhibit D at 22–23. Plaintiff testified at deposition that he went into the tank

[t]o see if there was any protrusions underneath the deck that we couldn't make a complete seal to. That was my main reason for going into the tank. But I would have had them, before the work started, they would have either—they would have covered the lightning holes going back in the area we are going to work, and the rest of the tank they would have cordoned off with either safety chain or rope or wire across there to keep people from getting over there and stepping through the holes.

Defendants' Exhibit A at 44–45.

Defendants had no duty to oversee the inspection to make sure it was conducted safely. *Scindia*, 451 U.S. at 172, 101 S.Ct. at 1624. Defendants were entitled to rely on WSI and plaintiff's expertise to perform the job with reasonable precautions. *Id.* WSI, not the vessel, had the duty to guard holes in the tank deck and provide lighting.

WSI, as plaintiff's employer, has a statutory responsibility to provide a safe work place. 29 C.F.R. § 1915 et seq. defines that responsibility in a series of regulations. As applied to this case, WSI's statutory responsibility included the duty to cover or guard the holes[3] in the tank deck and to provide lighting[4] in the tank. These regulations apply only to employers and not to vessel owners, unless "law, regulation or custom" imposes an independent duty on the owner. 29 C.F.R. § 1915.3(b). Plaintiff has pointed to nothing that would impose such an independent duty on defendants in this case.

WSI's statutory duties are especially relevant in light of the fact that WSI had knowl-

edge of the configuration of the holes in the tank deck.

Bo Williams, WSI's "competent person"[5] in charge of safety on the project, knew about the holes on the day the vessel came into the yard. Defendants' Exhibit D at 12, 15. The knowledge of the competent person is imputed to the employer. Mr. Williams did not warn anybody about the unusual holes because plaintiff told him that nobody besides Mr. Williams would be entering the tank. *Id.* at 21–22. Mr. Williams considered the holes to be a danger. *Id.* at 20–21. When Mr. Williams found out about the new work item and the inspection to be performed by plaintiff, he did not order lighting in the tank because he planned to go into the tank with plaintiff and act as a guide. *Id.* at 25–26. In fact, just prior to plaintiff entering the tank, Mr. Williams was set to warn plaintiff about the holes when he got a call on the radio. *Id.* at 20–25. Mr. Williams left for a short time, expecting plaintiff and the others to wait for him before entering the tank. *Id.*

Bill McKay, the assistant ship superintendent, followed plaintiff down the ladder into the tank. McKay testified at deposition that he was able to see the heating coil and the hole behind it from a position near the bottom of the access ladder. He did not warn plaintiff because he felt the large hole was "plainly obvious."

Thus, the evidence is undisputed that any hazard on the tank deck was known to WSI. The evidence suggests that the danger posed by the hole could have been easily removed or avoided by covering the hole and/or lighting the tank, a duty which fell on WSI. "Such circumstances cannot give rise to a breach of the duty of safe condition." *Bjar-*

---

3. "When employees are working in the vicinity of flush manholes and other small openings of comparable size in the deck or other working surfaces, such openings shall be suitably covered or guarded to a height of not less than 30 inches, except where the use of such guard is made impracticable by the work actually in progress." 29 C.F.R. § 1915.73(b). There is no evidence that covering the holes prior to plaintiff's inspection would have been impracticable, and no work was in progress in the tank.

4. "All means of access and walkways leading to working areas as well as the working areas them-

selves shall be adequately illuminated." 29 C.F.R. § 1915.92(a).

5. The term "competent person" means "a person who is capable of recognizing and evaluating employee exposure to ... unsafe conditions and is capable of specifying the necessary protection and precautions to be taken to ensure the safety of employees as required by the particular regulation under the condition to which it applies." 29 C.F.R. § 1915.4(*o*). Furthermore, the "responsibilities placed upon the competent person ... shall be deemed to be the responsibilities of the employer." 29 C.F.R. § 1915.3(c).

*anson,* 873 F.2d at 1208; *Ludwig v. Pan Ocean Shipping Co., Ltd.,* 941 F.2d 849, 851 (9th Cir.1991) ("In other cases, an obvious hazard can be removed or avoided easily enough that its presence cannot constitute a breach of the duty of safe condition.").

WSI's knowledge also relieved defendants of any duty to warn. The duty to warn requires the shipowner to warn the employer of any hazards "that are not known by" the employer. *Scindia,* 451 U.S. at 167, 101 S.Ct. at 1622. If the employer knows of a dangerous condition, it is the employer's duty to warn its employees, not the shipowner's. *See Bjaranson,* 873 F.2d at 1209 n. 7.

As a matter of law, defendants did not breach their duty to turn the ship over in a safe condition or their duty to warn in this case.

### B. *The Active Involvement and Active Control Duties*

■ Plaintiff argues that defendants are liable to him because defendants became actively involved in and took active control over the project of installing the tank openings. WSI's project manager initially presented defendants' port engineer, Guy Werner, with an estimate of $14,000 per tank to install the openings. This estimate included construction of staging. Mr. Werner explained that the job could be done without the use of staging, using the "water seal method," which would greatly lower the price. According to plaintiff,

> If Mr. Werner had allowed WSI to use staging, as originally proposed by Mr. Taylor, the WSI personnel who erected the staging would also have covered or surrounded any holes in the bunker tank through which workers might fall. By insisting on the cheaper but less safe method for accomplishing the extra work item, the vessel actively involved itself in and controlled the repair work in a manner that negligently caused injury to the plaintiff.

Memo in Opposition at 7–8.

This is not a case of active involvement. The evidence is undisputed that implementation of the work was left to WSI. Thus, while defendants specified the manner in which the work was to be performed, they did not involve themselves in doing the work.

With respect to the duty of active control, plaintiff compares the events of this case to those of *Cook v. Exxon Shipping Co., supra.* In *Cook,* a representative of the vessel instructed a worker to use a specific method and specific equipment to cut a hole in the deck. The vessel's representative ordered a welding torch be used rather than the air arc the employee was using, and an explosion resulted. The Ninth Circuit reversed a grant of summary judgment, holding that "[a] trier of fact could find that the workers could have avoided an explosion if they had used an air arc rather than a torch." 762 F.2d at 752.

Plaintiff argues that defendants' representative, Mr. Werner, required that the "water seal" method be used instead of the staging method, "which would have resulted in tank preparation that would have prevented the accident." Memo in Opposition at 8. Regardless of which method was used to install the openings, workers had to enter the tank. Thus, the suggestion or requirement that the "water seal" method be used lacks a causal connection to the accident and *Cook* is clearly distinguishable.

### C. *The Intervention Duty*

■ The duty to intervene arises when "1) the vessel is aware of the condition, 2) the vessel should realize the condition presents an unreasonable risk of harm to the longshoreman, and 3) the vessel knows that the stevedore, as a result of an 'obviously improvident' judgment, has failed to remedy the situation." *Bjaranson,* 873 F.2d at 1207 (quoting *Scindia,* 451 U.S. at 175–76, 101 S.Ct. at 1626).

The Ninth Circuit "has imposed an additional requirement for establishing the duty: the vessel must have helped create the hazard." *Torres v. Johnson Lines,* 932 F.2d 748, 750–51 (9th Cir.1991). An active role on the part of the shipowner in creating the hazard is required. For example, in *Davis v. Partenreederei M.S. Normannia,* 657 F.2d 1048 (9th Cir.1981), the shipowner's placement of the ship's equipment helped create the hazard.

In this case, the evidence is undisputed that the bunker tank, the holes in the tank deck and the heating coil were installed by the vessel's builder. Defendants had no active part in the design of the bunker tanks and did not alter or modify the design of the bunker tanks after delivery of the ship. Any hazard that resulted from the existence of the hole itself cannot serve as a basis for a duty to intervene.

The accident occurred because the employer failed to take precautions against a hazard of which it knew. WSI was responsible for creating the unsafe atmosphere in the tank when it decided not to cover the holes, light the tank and/or warn individual employees of the deck's configuration prior to the inspection. Defendants played no role in these decisions.

This is not the type of case in which the Ninth Circuit has chosen to impose a duty to intervene on the part of the shipowner.

It is the exceptional case, under *Scindia,* in which the shipowner remains liable as a "deep pocket" defendant, when it turns the vessel over to the [contractor for repairs].... To permit a jury to reimpose, under the guise of negligence, back-up liability for the [employer's] failure to provide adequate safety devices would be to repeal the statutory amendments and restore the pre–1972 practice which allowed longshoremen and their employers to pass the costs of loading and unloading accidents back to the ship under the rubric of unseaworthiness.

*Bandeen v. United Carriers (Panama), Inc.,* 712 F.2d 1336, 1341 (9th Cir.1983).

## CONCLUSION

Defendants have established as a matter of law that they did not breach any duties in this case. It is undisputed that WSI had knowledge of the alleged hazard on the tank deck. In spite of this knowledge, WSI took no precautions against the danger, even though they had the statutory duty to do so. Defendants did not involve themselves actively in the repair work. Although defendants specified the method of performing the work, implementation of the work was left entirely to WSI. Furthermore, the fact that defendants may have specified the method of doing the work does not change the fact that workers had to enter the tank, at least to inspect it if not in order to complete the work. Thus, any control defendants asserted over the repair work lacks a causal connection to the injury sustained by plaintiff. Finally, defendants played no part in creating the hazard which befell plaintiff. Under all the circumstances, and as a matter of law, defendants exercised due care and were entitled to rely on WSI to provide a safe workplace for its employees.

Defendants' Motion for Summary Judgment (# 21–1) is Granted. Defendants' Motion to Strike the Affidavit of Thomas J. Witt, Sr. (# 32–1) is Denied as moot.

ATTACHMENT
WITT DEPOSITION, EXHIBIT 3

APPENDIX