**Dolores Bodd CASACELI, Individually & as representative of succession of Joseph Stanley Bodd, etc., Plaintiffs-Appellees,**

v.

**MARTECH INTERNATIONAL, INC., et al., Defendants,**

**Trans Ocean Contractors, Inc. and Cheramie Bo-Truc #11, Inc., Defendants-Appellants.**

No. 84–4452.

United States Court of Appeals, Fifth Circuit.

Oct. 29, 1985.

Rehearing Denied Dec. 11, 1985.

---

Allen, Gooch, Bourgeois, Breaux & Robison, P.C., Randall K. Theunissen, Lafayette, La., for Trans Ocean.

Porteous, Hainkel, Johnson & Sarpy, James R. Carter, Glenn R. Adams, New Orleans, La., for Cheramie.

Morrow & Morrow, James P. Ryan, Opelousas, La., for plaintiffs-appellees.

Before CLARK, Chief Judge, RANDALL and JOLLY, Circuit Judges.

CLARK, Chief Judge:

Transocean Contractors, Inc., and the CHERAMIE BO-TRUC # 11 appeal the judgments against them in an action for damages resulting from the death of a diver, Joseph Bodd. Bodd drowned during an attempt to repair the CHERAMIE BO-TRUC while it was docked in a slip owned by Transocean. Because the evidence is not sufficient to support the verdicts against the appellants, we reverse.

## I

Joseph Bodd, an employee of Martech International, Inc. (Martech), worked as a diver's tender on board the CHERAMIE BO-TRUC # 11 for the two weeks prior to August 12, 1978. The vessel was conducting a salvage operation for CNG Producing Company in the Gulf of Mexico. Although Bodd had attended diving school for six months in 1975 and was a certified professional diver, he had never performed a professional dive. He did perform one unpaid 120 foot dive during this salvage operation.

The CHERAMIE BO-TRUC # 11 returned to the intercoastal waterway on August 12, 1978, and unloaded Martech personnel and equipment at a slip owned by Martech. It then docked at the adjacent slip owned by Transocean Contractors, Inc. (Transocean), approximately 100 feet away. While backing into the Transocean slip, the right propeller of the BO-TRUC became fouled and the starboard engine shut down. The captain docked the vessel by using the port engine. The BO-TRUC had docked at this slip four or five other times without encountering any problems. The slip contained a great deal of junk and debris.

Martech is a professional diving company. Although Captain Gaspard recommended dry-docking the BO-TRUC for repairs, his supervisors decided to contract with Martech for a diver to free the propeller. Martech sent Joseph Bodd and a diver's tender, Tom Runnels, to perform the contract.

Bodd and Runnels set up their diving station at the rear of the slip, sixty feet from the stern of the vessel. Debris in the dock area of the Transocean slip made it impossible for them to set up the station at the customary location, the stern of the vessel. The water in the slip was muddy and permitted only limited visibility. Visible debris floated at the edge of the slip.

Bodd made a total of four dives, all of which involved Bodd's walking from the shallow water at the shore out to the stern of the vessel, where the water was eight to ten feet deep. This was a sixty foot walk, during which Bodd's air hose had to be dragged over debris on the bottom of the slip.

Bodd first performed an inspection dive which lasted fifteen or twenty minutes. Bodd inspected both propellers and reported to Gaspard and Gaspard's supervisor, Buddy Curoles, that the starboard wheel was fouled with rope and the port wheel with cable. The CHERAMIE supervisors did not know the port wheel was also fouled until this time. Bodd also told the captain that the water depth at the stern of

the vessel was good because he could stand on the bottom and reach the propellers. Bodd did not complain about the location of the vessel nor did he ask the captain to move it out of the Transocean slip. Gaspard testified without contradiction that he relies on the diver's recommendations in these situations and that he would have moved the vessel if Bodd had so requested. However, he did not so advise Bodd. Runnels testified that he and Bodd did not request that the boat be moved because both propellers were fouled and they did not know it could be moved.

Gaspard and Curoles then contacted the charterer, CNG Producing Company. Curoles recommended dry-docking the boat. Because the vessel was needed for another job and it was thought dry-docking might take too long, the decision was made to request the diver to proceed with the wheel job in the Transocean slip.

Bodd performed three more dives. On each dive he complained over the radio to his tender about his air hose becoming tangled with the debris on the bottom of the slip. Gaspard and Curoles observed Bodd's dives. Gaspard heard the radio communications between Bodd and his tender. Transocean employees were also present during these diving operations.

On his second dive, which lasted approximately twenty minutes, Bodd unsuccessfully attempted to unravel the cable from the port wheel with a crowbar. Bodd terminated his third dive after thirty minutes because his cutting torch was not operating properly. During Bodd's fourth dive, Runnels noticed that the radio was dead and that air bubbles were no longer apparent. Runnels asked Gaspard and Curoles to pull on the air hose, and dived into the water to rescue Bodd. He was not successful. Gaspard and Curoles had great difficulty in pulling up the air hose which seemed to snag several times on something under the surface. When the air hose emerged, only the face gear was attached and the regulator was missing. Runnels testified that a missing regulator would allow water to enter the diver's mask and cut off his oxy-

gen. Runnels also testified that the diver would have to intentionally release the life line. He indicated that a diver should not release this line since it allows him to find his way back to the surface. Bodd's body was later found floating under the vessel near its bow.

A diver from another company, after performing an inspection dive the next day, told Gaspard that the job should be done in a dry dock. The vessel was then dry docked for the repairs.

## II

Dolores Bodd Casaceli, the representative of Bodd's estate, and Evelyn Bodd, his mother, sued Martech, Transocean and the CHERAMIE BO-TRUC # 11 for damages resulting from the death of Joseph Bodd. The plaintiffs settled with Martech. A jury found that Bodd was a longshoreman and not a seaman. The jury also found that Bodd was ten percent negligent and that Transocean and CHERAMIE were each forty-five percent at fault. The jury awarded the plaintiffs $75,000 for Bodd's conscious pain and suffering, and $150,000 for loss of love and affection to Evelyn Bodd. The plaintiffs also received an award of punitive damages in the amount of $250,000 from each defendant. The district court denied the motions of both defendants for judgment notwithstanding the verdict and a new trial. The court did remit the award for loss of love and affection from $150,000 to $75,000. CHERAMIE and Transocean appeal these judgments.

## III

We consider first the legal principles applicable to the vessel's appeal. The 1972 amendments to the Longshoremen's and Harbor Workers' Compensation Act (LHWCA) provided persons covered by the Act with an action against a vessel for injuries caused by the negligence of the vessel:

In the event of injury to a person covered under this chapter caused by the negligence of a vessel, then such person,

or anyone otherwise entitled to recover damages by reason thereof, may bring an action against such vessel as a third party in accordance with the provisions of section 933 of this title, and the employer shall not be liable to the vessel for such damages directly or indirectly and any agreements or warranties to the contrary shall be void. If such person was employed by the vessel to provide stevedoring services, no such action shall be permitted if the injury was caused by the negligence of persons engaged in providing stevedoring services to the vessel. If such person was employed to provide shipbuilding, repairing, or breaking services and such person's employer was the owner, owner pro hac vice, agent, operator, or charterer of the vessel, no such action shall be permitted, in whole or in part or directly or indirectly, against the injured person's employer (in any capacity, including as the vessel's owner, owner pro hac vice, agent, operator, or charterer) or against the employees of the employer. The liability of the vessel under this subsection shall not be based upon the warranty of seaworthiness or a breach thereof at the time the injury occurred. The remedy provided in this subsection shall be exclusive of all other remedies against the vessel except remedies available under this chapter. 33 U.S.C. § 905(b).[1] Longshoremen and harbor workers covered by the Act include persons engaged in ship repair. 33 U.S.C. §§ 902(3), 903(a). The Act defines "vessel" as "any vessel upon which or in connection with which any person entitled to benefits under this chapter suffers injury or death arising out of or in the course of his employment, and said vessel's owner...." 33 U.S.C. § 902(21). Recovery for disability or death is contingent on the occurrence of the injury while the vessel is "upon the navigable waters of the United States." 33 U.S.C. § 903(a).[2]

The United States Supreme Court defined the vessel's duty to longshoremen under these amendments in *Scindia Steam Navigation Co. v. De Los Santos*, 451 U.S. 156, 101 S.Ct. 1614, 68 L.Ed.2d 1 (1981) (longshoreman injured because of defective winch that stevedore used even though winch had been malfunctioning for two days). The vessel owner must provide work space, ship's gear, equipment, and tools in a condition that allows a stevedore, acting with reasonable care, to carry on his operations with reasonable safety. The owner must warn the stevedore of any hidden dangers which the owner knows or should know about in the exercise of reasonable care. 451 U.S. at 166–67, 101 S.Ct. at 1621–22. The owner need not supervise, inspect, or monitor the stevedoring operations for dangerous conditions that develop during that process unless required to do so by contract, positive law, or custom. *Id.* at 167–72, 101 S.Ct. at 1622–24. He may generally rely on the stevedore's exercise of reasonable care. *Id.* at 169–72, 101 S.Ct. at 1623–24. An exception to this lack of supervisory duty exists if the shipowner becomes aware of a dangerous condition in the ship's gear during the stevedoring operation, and is also aware that the stevedore is unreasonably failing to protect a longshoreman against this danger. The shipowner then has a duty to intervene and repair the gear constituting the danger. *Id.* at 172–76, 101 S.Ct. at 1624–26; *see also Hill v. Texaco, Inc.*, 674 F.2d 447, 450–51 (5th Cir.1982) (articulating the *Scindia* principles).

The Fifth Circuit has extended both the situations to which *Scindia* applies and *Scindia's* analysis of the vessel owner's duty to intervene. *Hill v. Texaco, Inc.* held that "[t]he rationale of *Scindia* is not limited to stevedoring operations. It clearly

---

1. The amendments also "abolished the longshoreman's right to recover for unseaworthiness and the stevedore's obligation to indemnify the shipowner." *Futo v. Lykes Bros. S.S. Co.*, 742 F.2d 209 (5th Cir.1984) (opinion on rehearing) (footnote and citation omitted).

2. "Navigable waters" includes "any adjoining pier, wharf, dry dock, terminal, building way, marine railway, or other adjoining area customarily used by an employer in loading, unloading, repairing, dismantling, or building a vessel." 33 U.S.C. § 903(a).

applies to any independent contractor and its harborworker employees covered by the LHWCA and working aboard ship." 674 F.2d at 451. The *Hill* court, however, found no basis for the imposition of liability on a shipowner who hired an independent contractor to determine the effect of rust on the thickness of tank walls. A contractor's employee who was not wearing a safety line was injured when he lost his footing because of loose rust and fell thirty feet. *Id.* at 448–53.

*Futo v. Lykes Bros. S.S. Co.* articulated an analysis of the shipowner's duty to intervene and the considerations that are pertinent to an imposition of this duty. 742 F.2d 209 (5th Cir.1984). *Futo* also involved the application of the *Scindia* principles in a context other than that of stevedoring. The employer in *Futo* was an independent contractor hired by a shipowner to perform repairs necessitated by Coast Guard regulations. 742 F.2d at 210. The longshoreman suffered a fatal injury when he fell to the deck of the ship from a scaffolding erected by his employer pursuant to its contract with the shipowner. *Id.* at 211. His widow sued the owner under § 905(b), claiming the owner negligently failed to warn the longshoreman of a hazardous condition—the scaffolding had no guardrail. *Id.* The Fifth Circuit held that the vessel owner had no duty to intervene, even if he had full actual knowledge of the danger. *Id.* at 221.

The *Futo* court noted that pre-*Scindia* cases in the Fifth Circuit concerning a vessel owner's duty to intervene held that "a shipowner would not be held liable under section 905(b) for dangerous conditions created by the stevedore and causing injury to its employees ... even where the owner had actual knowledge of the unsafe condition." *Id.* at 213 (citing *Brown v. Mitsubishi Shintaku Ginko*, 550 F.2d 331 (5th Cir.1977); *Gay v. Ocean Transport & Trading, Ltd.*, 546 F.2d 1233 (5th Cir. 1977)). The basis for these holdings was an analogy to the duties and exceptions to those duties of landowners toward employees of independent contractors under the Restatement (Second) of Torts, §§ 343,

343A. *Id.* at 212–13. The court found that *Scindia* reduced the scope of liability that those cases allowed, but did not negate the basic rationale underlying those decisions. *Id.* at 216. The *Futo* court found that the *Scindia* exception "does not ... extend to an open and obvious transitory condition" created and controlled by the independent contractor, and wholly related to the contractor's gear and operations. The missing guardrail was such a condition. *Id.*

Two post-*Scindia* cases supported this conclusion. The employee of an independent contractor sued a vessel owner for injuries resulting from the use of defective tongs in *Lewis v. Timco, Inc.*, 697 F.2d 1252 (5th Cir.), *modified in other respects*, 716 F.2d 1425 (1983). Although the plaintiff argued that the vessel's employees knew he had difficulty in using the tongs, the *Lewis* court held that the tongs were not part of the vessel's normal gear and that the vessel owner did not control or create the circumstances that caused his injury. *Id.* at 1256. The plaintiff in *Helaire v. Mobil Oil Co.* was employed by an independent contractor as a roustabout on a fixed platform in the Gulf of Mexico. 709 F.2d 1031, 1033 (5th Cir.1983). The contractor arranged for the transportation of materials to the platform with a vessel owner. *Id.* The plaintiff claimed his injuries were due to his fall on deck when he was required to unload the vessel in rough weather. *Id.* at 1037. The court held that *Scindia* imposed liability on the vessel owner for an employee's injuries occurring after unloading operations began if they "result[ed] from open and obvious dangers only in the event of actual knowledge of the danger *and* actual knowledge that he cannot rely on the stevedore to remedy the situation. He is not held to a duty to discover the condition or to anticipate its danger." *Id.* at 1038–39 (emphasis in original) (footnote omitted).

The *Futo* court thus concluded that "[t]o impose a duty to intervene on the shipowner, respecting dangers not created by it which are obvious to the stevedore's employees and arising during and in the area

of the stevedore's operations, *something more* is required than the mere shipboard location of the dangerous situation and the shipowner's knowledge of it." 742 F.2d at 215 (emphasis in original). Although the court refused to make a blanket rule, it stated that the extra requirement may sometimes "be satisfied if the accident is caused by a defective condition of the ship itself, its gear, or equipment." *Id.* (noting the language of *Scindia* and *Lewis*). A distinction between defects in the ship itself and its gear, and defects not directly related to the ship, is logical since the owner is primarily responsible for the ship, gains the most from its proper maintenance, and can usually best comprehend the danger from a defect in the ship, its gear or equipment. *Id.*

■ *Scindia*, therefore, requires the existence of two basic conditions for the imposition of the shipowner's duty to intervene—the shipowner's actual knowledge of a danger to a longshoreman, and the shipowner's knowledge that the longshoreman's employer is not acting reasonably to protect its employees from that danger. 451 U.S. at 175–76, 101 S.Ct. at 1626. The *Futo* court outlined considerations that pertain to the existence of these basic conditions: whether the danger was open and obvious; whether the danger was located within the ship or ship's gear; which party created the danger or used the defective item and was therefore in a better position to correct it; which party owned and controlled the defective item; whether an affirmative act of negligence or acquiescence in the use of the dangerous item occurred; and whether the shipowner assumed any duty with regard to the dangerous item. 742 F.2d at 218, 221.

## IV

■ We now turn to the principles of law relevant to the slip owner's appeal. General maritime law allows the survivors of a decedent to recover damages the decedent could have recovered but for his death. *See Moragne v. States Marine Lines, Inc.,* 398 U.S. 375, 90 S.Ct. 1772, 26 L.Ed.2d 339 (1970) (recognizing a wrongful death action under general maritime law); *Azzopardi v. Ocean Drilling & Exploration Co.,* 742 F.2d 890, 893 (5th Cir.1984) (acknowledging extension of *Moragne* principles by circuit courts to encompass a survival action under general maritime law); *Law v. Sea Drilling Corp.,* 523 F.2d 793, 798 (5th Cir.1975) ("There is a federal maritime cause of action for death on ... any navigable waters—and it can be enforced in any court."). Two requirements are necessary to establish admiralty jurisdiction for a maritime tort case—negligent conduct on navigable waters that causes harm and a significant relationship between that wrong and maritime activity. *Executive Jet Aviation, Inc. v. Cleveland,* 409 U.S. 249, 93 S.Ct. 493, 34 L.Ed.2d 454 (1972); *Sohyde Drilling & Marine Co. v. Coastal States Gas Producing Co.,* 644 F.2d 1132 (5th Cir.), *cert. denied sub nom Valero Energy Corp. v. Sohyde Drilling & Workover, Inc.,* 454 U.S. 1081, 102 S.Ct. 635, 70 L.Ed.2d 615 (1981); *Kelly v. Smith,* 485 F.2d 520 (5th Cir.1973), *cert. denied sub nom. Chicot Land Co. v. Kelly,* 416 U.S. 969, 94 S.Ct. 1991, 40 L.Ed.2d 558 (1974); *see also Richardson v. Foremost Ins. Co.,* 641 F.2d 314 (5th Cir.) (the maritime activity need not be exclusively commercial), *aff'd,* 454 U.S. 813, 102 S.Ct. 88, 70 L.Ed.2d 81 (1981). A wrong that begins on land but results in harm on navigable waters may constitute a maritime tort if these requirements are met. *See, e.g., Kamani v. Port of Houston Auth.,* 702 F.2d 612, 613 (5th Cir.1983) (longshoreman aboard vessel on navigable waters who was injured while trying to escape a descending land-based crane established a maritime case); *Kelly,* 485 F.2d at 521–26 (land occupiers on shore who shot at and injured deer poachers fleeing in boat on Mississippi River were liable for a maritime tort).

■ General principles of negligence guide the analysis of a maritime tort case. *Daigle v. Point Landing, Inc.,* 616 F.2d 825, 827 (5th Cir.1980) (citation omitted). A defendant owes a plaintiff a duty of ordinary care, which includes a duty to warn

only of harm that is reasonably foreseeable. *Daigle,* 616 F.2d at 827. The circumstances of the danger and the defendant's knowledge of the risk determine the required degree of care. *Id.* (quoting 57 Am. Jur.2d *Negligence* § 72 (1971)).

## V

On review of the denial of both motions for directed verdict and for judgment notwithstanding the verdict, we must view all of the evidence "in the light ... most favorable to the party opposed to the motion." *Boeing Co. v. Shipman,* 411 F.2d 365, 374 (5th Cir.1969). Judgment notwithstanding verdict is proper "[i]f the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict." *Id.*

## A

█ *Scindia,* as we have construed it, supplies the appropriate guidelines for our review of the evidence dispositive of the vessel owners' liability here since this case concerns the death of a longshoreman while directly engaged in ship repairs due to the alleged negligence of the vessel. An analysis of these facts under *Scindia* indicates that the vessel owners did not breach any duty they owed to Bodd under § 905(b). The record contains no evidence of negligence sufficient to sustain the jury's verdict.

First, as *Scindia* requires, the vessel owners provided Bodd with a reasonably safe work place and told Bodd as much as they knew about the condition of the propeller. The owners of the CHERAMIE BO-TRUC # 11 employed Martech as an expert independent contractor, whose employees were required to have skills which neither CHERAMIE nor Transocean employees possessed, to perform a hazardous activity. Although the muddiness of the water and presence of debris in the slip was apparent to all observers, the owners and their employees could not know the underwater condition of the slip, the extent of damage to the propeller, and the risks

that an underwater repair of the propeller (a wheel job) would necessitate. Only the expert diver, even a certified diver who was at the outset of his professional career, could make those determinations. The owners had to rely on his reasonable care in doing so.

The uncontroverted evidence showed that the vessel owners had used this slip four or five times in the past without encountering any difficulties, and that divers had performed wheel jobs in this slip without problems. This slip was adjacent to the slip belonging to Bodd's employer, Martech. Martech employees often performed wheel jobs. Before he made the first dive, Bodd knew the right propeller was so fouled that the starboard engine had shut down. He agreed to make the inspection dive even though conditions in the slip required that he set up his diving station sixty feet from the place where it would normally be positioned. After the inspection dive, Bodd did not report that he had encountered hazardous conditions below the surface. Rather, he told the captain of the vessel that the water at the stern of the boat was at a good depth for him to make the repairs. He did not request a relocation of the vessel into another slip or dry dock. He continued to make dives even though his air hose became entangled with debris on the bottom of the slip. The owners knew that Bodd was encountering difficulties with his equipment but they had no way of knowing that Bodd could not perform this wheel job with appropriate safety.

Appellees suggest that the CHERAMIE owners negligently failed to provide Bodd with a safe workplace because they moored the vessel so loosely that the nearby passage of other vessels caused it to move, and that this movement contributed to Bodd's perilous circumstances and death. The record contains no evidence that any vessel passed by the Transocean slip during or around the time of Bodd's final dive. This suggestion adds only speculation.

The owners of the CHERAMIE did not breach any duty imposed on them by *Scin-*

*dia* under § 905(b) to warn Bodd of unsafe conditions or to make them safe. A shipowner need not protect a longshoreman engaged in ship repairs "from risks that were inherent in the carrying out of the contract." *West v. United States*, 361 U.S. 118, 123, 80 S.Ct. 189, 193, 4 L.Ed.2d 161 (1959) (employee of contractor to whom ship had been totally turned over for an extensive overhaul was injured while performing repairs). "[A] ship may not be found negligent merely because a condition of the ship that requires repair or inspection injures the person hired to inspect or repair that condition." *Stass v. American Commercial Line, Inc.*, 720 F.2d 879, 883 (5th Cir.1983) (barge was not liable for injuries of employee of company hired to repair hull and grain doors due to slippery sprouted grain on deck and defective grain door because company was hired to inspect and repair that door and because cleaning the areas to be repaired was part of company's routine procedure) (quoting *Hill*, 674 F.2d at 452 n. 5).

■ Appellees argue that the underwater condition of the slip was the defect that caused Bodd's death and for which appellants are responsible. Although that condition is not the defect Martech was hired to correct, the above principles are analogous. Every underwater condition entails some hazard to a diver. When the water is opaque, the diver is the only person who can know whether the hazards present make safe diving impossible. Bodd was sent to this job because he was an expert in underwater repair. He had special skills and equipment that allowed him to work underwater while other repairmen could not. Appellants could not make safe the underwater conditions in which Bodd was specially hired to work and for which he was specially trained, nor could they have a duty to warn him of conditions which they could not know about unless someone in Bodd's profession made an inspection dive and told them about those conditions. Bodd's inspection dive supplied him with unique information about conditions under the water that were unknown and unknowable to the vessel owners. An inspection dive is a common procedure and its purpose is to determine whether an underwater repair job is possible. Runnels and Gaspard relied on the diver to make that determination.

Similarly, the vessel owners had no duty to intervene under *Scindia*. Since no contract, custom, or positive law required the owners to intervene and stop Bodd from attempting to repair the fouled propellers underwater, they had a duty to do so only if they knew the underwater conditions presented a danger to Bodd and that he was acting unreasonably in his continued attempts to accomplish the repairs under those conditions. The vessel owners did not possess this requisite knowledge.

We have held that the "[m]ere presence of the vessel's crew on the ship ... does not prove knowledge of the hazardous condition." *Hill*, 674 F.2d at 450 (quoting *Stockstill v. Gypsum Transp.*, 607 F.2d 1112, 1117 (5th Cir.1979), *cert. denied*, 451 U.S. 969, 101 S.Ct. 2044, 68 L.Ed.2d 347 (1981)). Similarly, knowledge that a condition or even a defect exists, does not imply knowledge that the condition is dangerous. *Cf. Futo*, 742 F.2d at 220 ("Knowledge that the condition of an object renders it dangerous *if* used in a particular way or under particular circumstances does not of itself necessarily evidence the requisite knowledge of actual danger.") (emphasis in original) (citing *Wild v. Lykes Bros. S.S. Corp.*, 734 F.2d 1124 (5th Cir.1984)).

■ The owners of the CHERAMIE knew the slip water was muddy and that debris was floating in the slip. However, they did not know both propellers were entangled until Bodd made his inspection dive. The owners knew Bodd was having difficulty with the repair work because he made repeated unsuccessful dives accompanied by radio complaints to his tender that his air hose was tangled with the debris. They also knew Bodd, the expert diver, continued to make subsequent dives. They knew he made no complaint or observation to them that these difficulties were life-threatening or extra-hazardous. Neither

observation of Bodd's difficulties nor knowledge of his complaints to his tender constituted actual knowledge on the part of CHERAMIE of danger to Bodd, or that he was acting unreasonably in his repeated attempts to repair the ship.

■ An analysis of the facts under the factors emphasized by the Fifth Circuit in *Futo* further supports the conclusion that the vessel owners were not negligent in this case. The evidence does not clearly demonstrate what condition or event actually or predominantly caused Bodd's death. The debris in the slip, the missing regulator, Bodd's own actions in shucking his mask and life line are all possible factors. Although the fouled propellers may have presented a danger to Bodd, that defect was the one he was hired to correct and the vessel is not liable for injuries due to it. *See West,* 361 U.S. at 123, 80 S.Ct. at 193; *Stass,* 720 F.2d at 883; *Hill,* 674 F.2d at 452. The defect which allegedly caused Bodd's death in this case, and for which appellees claim CHERAMIE is liable, was the underwater situation in which Bodd had to do his work. As in *Scindia, Lewis,* and *Helaire,* this defect was not a part of the ship's normal gear which the owner created or controlled. The district court noted that the vessel owners controlled the decision regarding *where* repairs should be conducted. They decided to request that Bodd attempt the wheel job in the slip rather than dry-docking the vessel. The chosen underwater work place, however, was the domain of the expert diver. Bodd, the independent contractor, decided whether he would make the initial inspection dive. He was not ordered, directed or even requested to continue over protest or after notice that to do so would be dangerous. By choosing to proceed, Bodd determined to attempt the repairs and to make every subsequent dive including the fatal one. The expert diver controlled this decision, not the vessel owner. The defect was not a part of the ship or ship's gear, but was a condition directly related to the diver's expertise, underwater work. The facts of this case indicate that the vessel owners

breached no duty which they owed to Bodd under § ˙905(b).

**B**

■ The facts also demonstrate that the slip owner did not violate the duty of ordinary care it owed to Bodd under general maritime law. Transocean had a duty to warn Bodd only of dangers that were reasonably foreseeable. *Daigle v. Point Landing, Inc.,* 616 F.2d at 827. The record indicates that Transocean neither knew nor had reason to foresee that performance of a wheel job in its slip might endanger a diver. Uncontroverted evidence showed that divers had performed wheel jobs in this slip without problems. The muddiness of the water and the floating debris in the slip were obvious conditions. [Bodd, the underwater expert, was the only party who knew that conditions beneath the surface presented danger to a diver performing an underwater wheel job.] The presence of Transocean employees near the slip at the time of Bodd's dives did not constitute knowledge of his danger. *See Daigle,* 616 F.2d at 828 (towboat master's ability to see actions of plaintiff did not establish a duty to warn plaintiff). Transocean had no duty to warn Bodd of conditions [which it had no reason to know were dangerous.]

**VI**

The evidence is not sufficient to support the verdicts against either appellant. Since we reverse on the negligence issue, we need not address the other issues CHERAMIE and Transocean raise—whether Starns was appropriately qualified as an expert; whether the awards for conscious pain and suffering, for loss of society, and for punitive damages were erroneous or excessive; and whether, as a matter of law, punitive damages are awardable in an action brought under § 905(b).

The judgments appealed from are reversed and the cause is remanded with directions to enter judgment for defendants.

REVERSED and REMANDED WITH DIRECTIONS.