795 F.2d 349
 1987 A.M.C. 1333
 Winifred G. BUBLA, in her own right and as Executrix of the
Estate of Joseph B. Bubla, deceased, Jamie Bubla,
Patricia Jacobs, and Joseph B. Bubla,
Jr., Appellees,
v.
Waverly Daniel BRADSHAW, Sr., Appellant,
and
Ann R. HUDGINS, Executrix of the Estate of Allen F. Hudgins,
Jr., deceased, Hudgins Marine Engine Service,
Ltd., a Virginia corporation, Appellees,
v.
Jennings HAYNES, Third-Party Defendant.
Winifred G. BUBLA, in her own right and as Executrix of the
Estate of Joseph B. Bubla, deceased, Jamie Bubla,
Patricia Jacobs, and Joseph B. Bubla,
Jr., Appellants,
v.
Waverly Daniel BRADSHAW, Sr., Ann R. Hudgins, Executrix of
the Estate of Allen F. Hudgins, Jr., deceased,
Hudgins Marine Service, Ltd., a Virginia
corporation, Appellees,
v.
Jennings HAYNES, Third-Party Defendant.
Winifred G. BUBLA, in her own right and as Executrix of the
Estate of Joseph B. Bubla, deceased, Jamie Bubla,
Patricia Jacobs, and Joseph B. Bubla,
Jr., Appellees,
v.
Ann R. HUDGINS, Executrix of the Estate of Allen F. Hudgins,
Jr., deceased, Hudgins Marine Engine Service,
Ltd., a Virginia corporation, Appellants,
and
Waverly Daniel BRADSHAW, Sr., Appellee,
v.
Jennings HAYNES, Third-Party Defendant.
 Nos. 85-2318(L), 85-2377 and 85-2396.
 United States Court of Appeals,
Fourth Circuit.
 Argued May 6, 1986.
Decided July 8, 1986.
 
 Gordon P. Robertson and Walter B. Martin, Norfolk, Va., (Vandeventer, Black, Meredith & Martin, Norfolk, Va., on brief), for appellant Waverly Daniel Bradshaw, Sr.
 A. Davis Bugg, Jr. (Dunton, Simmons & Dunton, White Stone, Va., on brief), for appellant Ann R. Hudgins.
 John R. Crumpler, Jr. (Seawell, Dalton, Hughes & Timms, Norfolk, Va., on brief), for appellees.
 Before MURNAGHAN and WILKINSON, Circuit Judges, and HAYNSWORTH, Senior Circuit Judge.
 WILKINSON, Circuit Judge:
 
 
 1
 Joseph Bubla died of electrocution while conducting a marine survey aboard The Grand Floatel, a houseboat owned by defendant Waverly Bradshaw. At the time of the accident, the boat was docked at a pier owned by defendant Allen Hudgins and his wife Ann and leased to defendant Hudgins Marine Engine Service, Ltd. A receptacle on the dock provided electricity to The Grand Floatel. Bubla's wife and children brought this wrongful death action under general maritime law, Moragne v. States Marine Lines, Inc., 398 U.S. 375, 90 S.Ct. 1772, 26 L.Ed.2d 339 (1970), alleging negligence on the part of Bradshaw, Hudgins, and Hudgins Marine. Though absolving Hudgins of individual negligence, the district court found both Bradshaw and Hudgins Marine negligent, and Bubla contributorily negligent. It apportioned damages accordingly, awarding plaintiffs $100,578.
 
 
 2
 We affirm the district court's conclusion that admiralty jurisdiction was proper here and that Hudgins Marine negligently contributed to the death of Joseph Bubla. Our review of the record convinces us, however, that Bradshaw could not reasonably have foreseen the problems that caused Bubla's electrocution, and accordingly was not negligent. Finally, though we recognize the district court's wide discretion in measuring damages in a wrongful death action, we remand for a more detailed explanation of the basis for and apportionment of damages in this case.
 
 I.
 
 3
 Waverly Bradshaw purchased The Grand Floatel in November, 1982. The houseboat had been sunk at least twice and needed extensive repairs. Bradshaw hired Hudgins to repair the vessel and accordingly moved it to Hudgins Marine in December, 1982. During the next several months, Bradshaw visited The Grand Floatel on several occasions, staying overnight on the boat three times.
 
 
 4
 On March 27, 1983, Bradshaw met Bubla on the boat. Bubla, recommended to Bradshaw by a marina owner, was to conduct a marine survey for insurance purposes. He had been performing marine surveys for three years, and surveyed approximately 200 boats during this period.
 
 
 5
 The accident occurred near the end of Bubla's survey, as he inspected the boat's engine compartment. The district court found that three defects contributed to Bubla's electrocution, which would not have occurred in the absence of any one of the conditions. First, the electrical outlet on Hudgins Marine's pier, to which The Grand Floatel was connected, was wired with reverse polarity. When polarity is reversed, the neutral white wire and the hot black wire are improperly crossed, making the boat's normally neutral wire hot and its hot wire neutral. Second, there existed an inadvertent connection on the boat between the ground system and the normally neutral, but now electrically charged, wires. Both the engine and the outlet box in the engine compartment, connected to the ground system, thereby became electrically charged. Under normal circumstances, these conditions would have caused the circuit breaker in Hudgins Marine's shop to trip, cutting off the electrical current because of an improperly charged ground. A defect in the grounding system, however, rendered the circuit breaker inoperative. Bubla accordingly was electrocuted when he came in contact with the energized engine or outlet and also touched a grounded surface, thereby completing a circuit.
 
 II.
 
 6
 We agree with the district court that this case falls within the admiralty jurisdiction of the federal courts, 28 U.S.C. Sec. 1333. Historically, such jurisdiction was proper whenever a tort occurred on the high seas or on navigable waters. See, e.g., The Plymouth, 70 U.S. (3 Wall) 20, 35-36, 18 L.Ed. 125 (1866). The parties do not dispute that Bubla died aboard The Grand Floatel, and that the situs of this tort supports the invocation of admiralty jurisdiction. Under Executive Jet Aviation, Inc. v. City of Cleveland, 409 U.S. 249, 269, 93 S.Ct. 493, 505, 34 L.Ed.2d 454 (1972), however, one seeking to come within admiralty must also show that the wrong "bears a significant relationship to traditional maritime activity." See also Foremost Insurance Co. v. Richardson, 457 U.S. 668, 102 S.Ct. 2654, 73 L.Ed.2d 300 (1982). Though Bradshaw concedes the propriety of admiralty here, Hudgins and Hudgins Marine assert that this additional "nexus" requirement is not satisfied on these facts.
 
 
 7
 Four factors must be considered "in analyzing the relationship a given claim bears to traditional maritime activity: (1) the functions and roles of the parties; (2) the types of vehicles and instrumentalities involved; (3) the causation and type of injury; and (4) traditional concepts of the role of admiralty law." Oman v. Johns-Manville Corp., 764 F.2d 224, 230 (4th Cir.1985) (en banc ), cert. denied sub nom. Oman v. H.K. Porter Co., --- U.S. ----, 106 S.Ct. 351, 88 L.Ed.2d 319 (1986). See also Hassinger v. Tideland Electric Membership Corp., 781 F.2d 1022, 1027-28 (4th Cir.1986), petitions for cert. denied, --- U.S. ----, ----, 106 S.Ct. 3294, 90 L.Ed.2d ---- (1986). The district court properly considered these factors and applied maritime law, which conferred federal jurisdiction and invoked principles of comparative negligence.
 
 
 8
 The functions and roles of the parties clearly support admiralty jurisdiction. Joseph Bubla boarded The Grand Floatel as a marine surveyor, a job for which his experience with boats and maritime activities was crucial. As noted by the district court, "Bubla's job could not have been duplicated on land, nor could anyone inexperienced in maritime matters have performed the survey." The survey, moreover, related to insurance coverage for seagoing craft. Hudgins Marine and Hudgins likewise performed services related to maritime activity, providing the boat slip at which The Grand Floatel was docked for repairs and inspection, and electricity for use on boats docked at the pier.[1]
 
 
 9
 The types of vehicles and instrumentalites involved also related to traditional maritime activity. The mere fact that the injury occurred on a boat, of course, does not dictate the application of admiralty. See, e.g., Oman, 764 F.2d at 231. In Oman, this court found admiralty improper because the claims, while arising on a ship, "would be exactly the same if the plaintiffs had been employed constructing or repairing buildings on land." Here, by contrast, the vessel and pier possess a "uniquely maritime character," id., that supports the application of admiralty. Though principles of electricity are of universal application, the nature of electrical forces in an aqueous environment presents distinct problems. As trial testimony indicated, use of electricity on or near the water demands special maritime materials and unique precautions. Receptacles, extension cords and splicing materials, for example, are available in marine versions designed to reduce the incidence of electrical problems caused by wet conditions.
 
 
 10
 The cause and type of injury here similarly support admiralty jurisdiction. Though electrocution is not peculiarly a maritime mishap, evidence indicates that the characteristics of a maritime environment may indeed have contributed to Bubla's death. Possible factors involved in the accident included water in the engine compartment of the boat and grounding wires on the dock that were rendered inoperative from exposure to the elements, including water under the dock. Thus, unlike Oman, this case involves injuries arising out of a maritime context rather than fortuitously occurring on or near navigable waters, and is properly considered under maritime law.
 
 
 11
 Finally, we consider "the traditional concepts of the role of admiralty law, the most important factor." Oman, 764 F.2d at 231. "That law," the Supreme Court explained in Executive Jet, 409 U.S. at 270, 93 S.Ct. at 505, "deals with navigational rules ..., how to determine whether a particular ship is seaworthy, and ... the nature of maintenance and cure. It is concerned with maritime liens, the general average, captures and prizes, limitation of liability, cargo damages and claims for salvage." The instant case touches upon the maintenance and repair of seagoing vessels. It required, as the district court observed, an examination of "the negligence of a marine surveyor, a vessel owner, and a vessel repair marina." These concerns are maritime in nature. The standards of care that marinas owe vessel owners, that vessel owners owe inspectors and surveyors, and that maritime surveyors must exercise themselves are all implicated. The action accordingly is flavored in admiralty and falls within the federal court's expertise and unique concern for maritime matters.
 
 III.
 
 12
 Bradshaw and Hudgins Marine dispute the district court's finding that they were negligent in Bubla's death. The general standard of care is well-established. "It is a settled principle of maritime law that a shipowner owes the duty of exercising reasonable care towards those lawfully aboard the vessel who are not members of the crew." Kermarec v. Compagnie Generale, 358 U.S. 625, 630, 79 S.Ct. 406, 409, 3 L.Ed.2d 550 (1959). Courts have also recognized that a slip owner under admiralty jurisdiction owes a duty of ordinary care toward those who use the pier.[2] See Casaceli v. Martech International, Inc., 774 F.2d 1322, 1328, 1331 (5th Cir.1985). The duty of ordinary care includes, of course, a duty to warn of harm that is reasonably foreseeable under the circumstances. Id. at 1328-29. Reviewing the facts under this standard, we conclude that Bradshaw was not negligent, for the events which caused Bubla's death were not reasonably foreseeable to him. Hudgins Marine, by contrast, knew or should have known of the reversed polarity in the pier receptacle, and was accordingly negligent in failing to warn Bubla of the condition.
 
 
 13
 We first consider Bradshaw's assertion that he owed no duty to Bubla under the "inherent risk" doctrine, and affirm the district court's conclusion that this doctrine is not applicable here. Several courts have recognized that a shipowner cannot be charged with negligence when an independent contractor is injured by the very condition which he is hired to repair or test. See West v. United States, 361 U.S. 118, 80 S.Ct. 189, 4 L.Ed.2d 161 (1959); Stass v. American Commercial Lines, 720 F.2d 879 (5th Cir.1983); Hill v. Texaco, 674 F.2d 447 (5th Cir.1982). These cases involved repairmen hired to remedy a specific condition or perform extensive overhaul or an inspector hired to inspect a particular defect. In those circumstances, the very nature of the task implied the possibility of a dangerous defect. Defendants, accordingly, were "under no duty to protect [the contractors] from risks that were inherent in the carrying out of the contract." West, 361 U.S. at 123, 80 S.Ct. at 193.
 
 
 14
 Here, by contrast, Bubla was retained to perform a general vessel survey. This contract implied no particular defects on The Grand Floatel. It was instead a standard survey for insurance coverage, which presumably results in approval of the boat's condition in many circumstances. Thus, though Bubla's task required inspection of the boat's electrical system, it gave him no particular reason to suspect that the system was dangerous. Cf., Hill v. Texaco, 674 F.2d 447. Nor was this general inspection an inherently dangerous activity relieving the boat owner of his duty to Bubla. Cf., Casaceli, 774 F.2d at 1330. A general marine surveyor cannot be said to assume the risk of any and every defect that may exist on a boat. Accordingly, we agree with the district court that he "is owed a duty by the vessel owner to warn of latent conditions that the owner knew or could have reasonably foreseen were potentially dangerous."
 
 
 15
 We disagree, however, with the court's conclusion that Bradshaw breached that duty here. In concluding that Bradshaw should have known of the boat's defective wiring and warned Bubla, the court relied upon expert testimony identifying numerous substandard conditions on The Grand Floatel after post-accident inspections. Expert testimony, however, does not invariably establish a layman's duty of care. There is no evidence that Bradshaw possessed a special expertise about electricity that gave him reason to know of these dangers. One witness identified Bradshaw as "very naive about the electrical system on the boat," and Bradshaw testified that he had no more knowledge of electricity than the average person.
 
 
 16
 Having recently purchased the boat, moreover, Bradshaw had experienced only minor problems with the electrical system that gave him no reason to foresee broader deficiencies. On several occasions, Bradshaw's use of appliances tripped circuit breakers in Hudgins Marina, and he naturally attributed this to overloading. Bradshaw also received a slight shock when he touched a metal lampshade aboard the boat. Rather than a warning of widespread electrical problems, however, such a shock more reasonably suggested a problem with the lamp involved. Though experts testified that these incidents were "an indication that something was certainly wrong with the wiring system on the boat," we find that they would not convey that message to a reasonable person without special expertise in electricity. A homeowner is not, by virtue of that status, a master electrician. Neither is a houseboat owner expected to be. In addition, Bradshaw could hardly be charged with foreseeing the contributory cause of reversed polarity in the electrical outlet on the pier. Without the benefit of expertise or hindsight, Bradshaw acted reasonably under the circumstances and accordingly did not breach his duty to Bubla. The district court's conclusion to the contrary is clearly erroneous. See Tullos v. Resource Drilling, Inc., 750 F.2d 380, 385 (5th Cir.1985) ("Questions of negligence in admiralty cases are fact questions.").
 
 
 17
 Hudgins Marine, however, breached its duty to Bubla because it knew or should have known of the dangerous conditions under its control, most notably the reversed polarity on the pier receptacle.[3] Hudgins had worked around marinas for years, and testified that boat owners frequently reversed polarity on pier receptacles. "I worked at Narrows Marina years ago, and they were always ... changing them over there. If you go to a marina, you'll find half the plugs they plug into are burned. It just seems to be that way with boats." Aware that reversed polarity is, for whatever reason, not uncommon in the maritime context, marina owners concerned about its effects check their outlets with inexpensive polarity testers, according to testimony at trial. Such a test here would have revealed the condition to Hudgins Marina, as a post-accident check revealed. The failure either to correct or warn of this dangerous condition constituted a breach of Hudgins Marine's duty of ordinary care.
 
 
 18
 The district court, applying comparative negligence principles well-established in admiralty, Pope & Talbot, Inc. v. Hawn, 346 U.S. 406, 74 S.Ct. 202, 98 L.Ed. 143 (1953), concluded that Bubla's own negligence contributed to 40% of the total harm. It was raining on the day Bubla inspected The Grand Floatel, yet he climbed into the engine compartment of the boat, open to the rainstorm, without first shutting off the electrical current. Experts testified that the power should have been disconnected under these circumstances, and common sense would dictate a similar course to the layman. Accordingly, we affirm the district court's conclusion that Bubla was contributorily negligent, and find the court's apportionment of fault well within its discretion.
 
 IV.
 
 19
 The district court assessed damages to Bubla's widow for loss of services, society and support at $150,000. Bubla's children each suffered $3,000 damages for loss of society and services. The child living at home also lost support for a year, valued at $4,000. After including $4,360 in medical and funeral expenses, the court reduced the award to reflect Bubla's negligence and found plaintiffs entitled to recover $100,578. Plaintiffs moved to amend the final order, seeking increased damages, prejudgment interest and a more detailed explanation of the damages computation. The district court denied this motion, and plaintiffs renew their contentions on appeal.
 
 
 20
 We remand to the district court for a more detailed explanation of the calculation of damages. We have, of course, recognized the latitude afforded a finder of fact asked to assess damages in a wrongful death action, where "no award ... is entirely free of speculative elements." Whitaker v. Blidberg Rothchild Co., 296 F.2d 554, 555 (4th Cir.1961). See also Sea-Land Services, Inc. v. Gaudet, 414 U.S. 573, 591, 94 S.Ct 806, 818, 39 L.Ed.2d 9 (1974). The fact that "[i]nsistence on mathematical precision would be illusory," Whitaker, 296 F.2d at 555, however, does not absolve the district court of its duty to "make findings of fact which separately state the amount for each element of damage ... and which, to the extent practical, set forth how the court arrived at each of those amounts." Scheel v. Conboy, 551 F.2d 41, 44 (4th Cir.1977). See also Little Beaver Enterprises v. Humphreys Railways, 719 F.2d 75 (4th Cir.1983). Here, the district court merely announced the damages after noting briefly the relationship of the plaintiffs to Bubla and stating Bubla's income and medical and funeral expenses. It did not, for example, consider Bubla's earnings expectancy or his rate of personal consumption in determining the value of lost support. Because we find this explanation insufficient, we do not consider plaintiffs' claims that the damages awarded were inadequate.
 
 
 21
 We affirm the court's decision not to award prejudgment interest. The decision to award or deny such interest rests within the sound discretion of the trial court. Ameejee Valleejee and Sons v. M/V Victoria U., 661 F.2d 310, 313 (4th Cir.1981). The district court's careful explanation of its decision to deny prejudgment interest establishes that it did not abuse its discretion here.
 
 V.
 
 22
 For the reasons stated above, the judgment of the district court is hereby
 
 
 23
 AFFIRMED IN PART, REVERSED IN PART, AND REMANDED WITH DIRECTIONS.
 
 
 
 [1]
 Hudgins argues that admiralty jurisdiction "does not embrace extensions of land such as docks or piers," and that accordingly the provision of a dock for The Grand Floatel does not bring him within admiralty. The "extension of land" doctrine, however, is used not to determine the nexus of an accident to maritime activity, but rather to determine the situs of the harm. See, e.g., Victory Carriers, Inc. v. Law, 404 U.S. 202, 206-07, 92 S.Ct. 418, 422, 30 L.Ed.2d 383 (1971). Here, the injury clearly occurred on navigable waters
 
 
 [2]
 Apparently adhering to its argument that admiralty is not proper here, Hudgins Marine asserts that it owed Bubla only the duty owed a licensee, applying principles of Virginia law. We find, however, that Kermarec, though considering specifically the duty of a shipowner, broadly abolished such distinctions for those properly within admiralty, and that accordingly Hudgins Marine owed Bubla a duty of ordinary care
 
 
 [3]
 We affirm the district court's conclusion that Hudgins was not personally liable. Though he personally supervised the installation of the pier's receptacle boxes, no evidence suggested whether the polarity was reversed upon initial installation or as the result of apparently common tampering. The corporation, however, was clearly responsible for maintenance of the boxes and should have been aware of the condition when the accident occurred