## KIRBY, etc. v OMI CORP.

### Case No. 86-10500-CA

Fourth Judicial Circuit, Duval County

March 1, 1989

### APPEARANCES OF COUNSEL

**C. Rufus Pennington, III,** and Rodney S. Margol, Esquire, Margol & Pennington, for plaintiff.

**George D. Gabel, Jr.,** and **J. Carol McDonald,** Gabel, McDonald, Anderson & Dees, for defendant.

### OPINION OF THE COURT

FREDERICK B. TYGART, Circuit Judge.

#### ORDER GRANTING MOTION FOR JUDGMENT IN ACCORDANCE WITH MOTION FOR DIRECTED VERDICT

This is a maritime case arising under the provisions of the 1972 Amendments to the Longshoremen's and Harbor Workers' Compensation Act, (hereinafter "LHWCA"), 33 U.S.C. Section 905(b). The plaintiff's decedent, Roy Alan Kirby, Sr., ("Kirby") was an employee of North Florida Shipyard, Inc. (the "shipyard"). He died as a result of an accident on board the OMI WABASH, an ocean-going vessel

owned by OMI Corp. (the "shipowner"), which was at the shipyard in Jacksonville for repairs during December 1985 and January 1986. The jury returned a verdict finding the shipowner and Mr. Kirby both negligent in the amounts of 75 percent and 25 percent respectively. Total damages were found to be $671,000. This Court accordingly entered judgment in favor of plaintiff in the amount of $503,250, or 75 percent of $671,000. The shipowner timely moved for a judgment in accordance with motion for directed verdict under Rule 1.480, Rules of Civil Procedure, having made a motion for a directed verdict at the close of the plaintiff's case which was renewed at the close of all of the evidence. In its motion, the shipowner challenges the sufficiency of the evidence to show that the shipowner was negligent and that such negligence was a legal cause of damage to the plaintiff.

## I. FACTS

The relevant facts are undisputed. The accident occurred on January 15, 1986. The vessel was at the shipyard for repairs, primarily for conversion to a segregated ballast system. The shipyard had installed a dresser coupling in the cargo pipeline in No. 2 center tank during the course of the work,and the shipowner's port engineer found the installation to be unsatisfactory. He communicated his dissatisfaction to the ship's coordinator, an employee of the shipyard, who in turn instructed the shipyard and foreman to place stops and hangers on the dresser coupling and piping. It is clear that prior to the accident all parties had knowledge that the dresser coupling did not have adequate stops and stays. Mr. Kirby was thereafter in the process of placing a hanger on the pipe when the ship's coordinator, Oland Cutchin, ordered the conducting of a hydrostatic test of the same piping on which Mr. Kirby was working. As water was forced through the pipes to conduct the test, the dresser coupling came off the pipe to which it had been affixed, and the bellmouth assembly struck and killed the plaintiff's decedent. While the port engineer and crew may have had knowledge that a hydrostatic test would ultimately be conducted, no one from the shipowner was aware that the repairs were being made at the same time that the hydrostatic test was being conducted. In fact, Mr. Cutchin, the shipyard's coordinator, testified as follows:

Q: Did the port engineer or anyone from the OMI WABASH have anything to do with scheduling that repair?

A: No, sir.

Q: Was that entirely up to the shipyard?

A: That's entirely up to the shipyard. . . .

52

Q: Had a decision been made to or was a decision made to conduct a hydrostatic test that day on the OMI WABASH?

A: Yes, sir. I made the decision. . . .

Q: Did the port engineer or anyone from the OMI WABASH have anything to do with scheduling that hydrostatic test?

A: No, sir. . . .

Q: Mr. Cutchin, did you know that Mr. Kirby was doing that repair at the time you made the decision to start the hydrostatic test.

A: No, sir. If I had of, I would not have started the hydrostatic test.

Q: And why is that?

A: Well, you're never supposed to hydrostatically test a line if someone's working on it. Never.

Q: As between the owner of the OMI WABASH and North Florida Shipyard, who was responsible for making sure that Mr. Kirby was not in that tank working on this pipe during the hydrostatic test?

A: Unfortunately we are, North Florida Shipyard.

Q: Was there anything inherently dangerous about installing hangers or stops on that line down in the number two tank?

A: Under normal circumstances, no sir.

The only question about which reasonable men could disagree is whether the shipowner failed to provide proper plans and specifications for the modifications to be performed on the vessel by the shipyard. There was conflicting testimony as to whether the plans and specifications reflected the proper supports and restraints for the installation of the dresser coupling and whether there should have been a dresser coupling at that location at all. What the plans and specifications called for was irrelevant, however, because the shipowner's port engineer, Walter Gustafson, made it clear that the installation of the dresser coupling without supports and restrains was unsatisfactory. He testified:

Q: When you went down into the two center tank with Mr. O'Boyle and Mr. Hewitt, what happened down there?

A: The way the present installation was, it was unsatisfactory.

Q: Why was that?

A: Because there was no stops on the dresser coupling, plus . . .

Q: I'm sorry. Plus what?

**53**

A: Plus the pipe and the line, the way it was installed would require additional supports.

Q: Was it satisfactory to you to use a dresser coupling in that location?

A: Not as it was installed.

Q: Was it satisfactory to you to use a dresser coupling installed in a different manner?

A: Only if it would meet the regulations.

Q: And what regulations?

A: Coast Guard regulations.

Q: Do you know specifically what regulations pertain to use of dresser couplings on cargo lines?

A: Yes.

Q: What are they?

A: The piping has to be properly supported and stops have to be installed. . . .

Q: When you say the pipe would have additional support, are you talking about connecting steel from the pipe to some other location?

A: To the structure of the vessel, yes.

It is undisputed that whatever defect there may have been in the plans and specifications was called to the shipyard's attention and that the repairs in progress at the time of the accident were being made by the shipyard because the shipowner's port engineer had rejected the existing work as unsatisfactory. He specifically required that the coupling and pipe have supports and restraints before the work would be accepted, which were the very elements that plaintiff alleged were missing from the plans furnished by the shipowner to the shipyard.

## II. APPLICABLE LAW

Prior to 1972, an injured longshoreman or harbor worker could recover against the vessel owner if he could prove that he had been injured as a result of the unseaworthiness of the vessel. Under this broad standard, the vessel owner was liable even if the unsafe condition had been created by the stevedore or other marine contractor. In 1972, Congress amended the LHWCA, substituting negligence for unseaworthiness as the shipowner's standard of care. Under the present standard, the vessel owner is liable only for the failure of the vessel or its owner to exercise reasonable care. 33 U.S.C. Section 905(b).

54

In *Scindia Steam Navigation Co. v De Los Santos,* 451 U.S. 156, 101 S.Ct. 1614, 68 L.Ed.2d 1 (1981), the Supreme Court of the United States outlined the duties a shipowner owes to a contracting stevedore and its longshoremen. Specifically, the Court stated that the shipowner is entitled to rely on the stevedore's judgment unless the shipowner becomes aware and has actual knowledge of a hazard on the ship and that the stevedore is unreasonably failing to protect the longshoremen against that hazard, at which time it has a duty to intervene and remedy the hazard.

The rationale of *Scindia* is not limited to stevedoring operations and applies to a shipyard and its harbor worker employees working aboard the ship. *Casaceli v Martech International, Inc.,* 774 F.2d 1322 (5th Cir., 1985), at pages 1326 and 1327. In the context of repair operations, however, a vessel owner's duty to the shipyard and its workers is subtly altered. *Stass v American Commercial Lines, Inc.,* 720 F.2d 879 (5th Cir., 1983), at page 882. The Supreme Court of the United States in *West v United States,* 361 U.S. 118, 80 S.Ct. 189, 4 L.Ed.2d 161 (1959) stated:

> "It appears manifestly unfair to apply the requirements of a safe place to work to the shipowner when he has no control over the ship or the repairs, and the work of repair in effect creates the danger which makes the place unsafe. The [shipowner], having hired [the shipyard] to perform the overhaul and reconditioning of the vessel — including the testing — was under no duty to protect petitioner from risks that were inherent in the carrying out of the contract."

*Id.* at 123, 80 S.Ct. at 193.

The Plaintiff argues that the shipowner was negligent in furnishing defective drawings to the shipyard and that such negligence proximately contributed to cause Mr. Kirby's death, but regardless of what was provided for in the plans all parties had knowledge that the dresser coupling did not have adequate stops and stays. The facts in the case of *Peters v Titan Navigation Co.,* 857 F.2d 1342 (9th Cir., 1988), are similar to the facts in this case. In *Peters,* the defendants had performed conversion repairs on the ship's hydraulic system, and the shipyard was contracted to repair the defect in the system. The defendants in *Peters* conceded that they had been negligent in creating the defect, but the court held that the defendants were not liable for the injuries because the Plaintiff was injured by a defective condition he was hired to correct. Similarly, in the present case, the plaintiff alleges that the shipowner's plans and specifications contained a defect. The evidence is conflicting as to whether the plans were defective. Nonethe-

less, the owner's port engineer refused to accept the work and the job that was to be performed by the shipyard was to correct the defect. The court in *Peters* stated the applicable principles involved: (a) a vessel owner is not liable for damages inherent in carrying out the repair contract, (b) there is no negligence liability when a repairman is injured by the very condition he is hired to repair, and (c) an employee cannot recover for injuries received while doing an act to eliminate the cause of injury.

The *Peters* case relies upon *West v United States,* supra, the principal case dealing with the liability of a shipowner while his vessel is at a shipyard, a case which contains facts strikingly close to the ones here. In *West,* an end plug from a one inch pipe in the water system was propelled through the top of the open cylinder and hit the plaintiff's knee when another employee of the shipyard turned on the water without warning, and the plug was forced off, hitting the plaintiff. The Supreme Court of the United States said at 4 L.Ed.2d 165:

> There was no hidden defect in the water system. It was one of the objects to be repaired and its plugs were to be replaced where necessary. Its testing was to be done by the contractor . . . not by the shipowner.

The rule in *Scindia* is discussed in the case of *Helaire v Mobil Oil Co.,* 709 F.2d 1031 (5th Cir., 1983), at page 1039, which reiterates that a shipowner has no duty to discover a condition or to anticipate its danger, the critical questions being (a) whether the shipowner knew of the dangerous condition *and* (b) whether it knew that the shipyard was not adequately protecting its employees. The court makes the following statement at page 1043:

> Prior to the decision of the United States Supreme Court in *Scindia Steam Navigation Co. v De Los Santos,* this Circuit held a vessel owner liable under 33 U.S.C. Section 905(b) for injuries to a longshoreman from open and obvious dangers if the owner knew, or if he should reasonably have foreseen, the dangerousness of the condition. *Scindia* makes clear, however, that liability in such cases can be imposed only if the owner has actual knowledge of the dangerous condition as well as actual knowledge that the stevedore is not acting to protect the longshoreman.

Similarly, the court in *Casaceli v Martech Intern., Inc.,* 774 F.2d 1322 (5th Cir., 1985), in discussing the *Scindia* case stated at pages 1327 and 1328:

. . . *Scindia* imposed liability on the vessel owner for an employee's

injuries occurring after unloading operations began if they "result[ed] from open and obvious dangers only in the event of actual knowledge of the danger *and* actual knowledge that he cannot rely on the stevedore to remedy the situation. He is not held to a duty to discover the condition or to anticipate its danger . . .

In *Stass v American Commercial Lines, Inc.*, 720 F.2d 879 (5th Cir., 1983), the court discusses the *Scindia* principles as they apply to a vessel owner's duties while its vessel is at a shipyard. At pages 882 through 885, the court states:

> In the context of repair operations, however, a vessel owner's duty to the shipyard and its workers is subtly altered. The courts have long recognized that the vessel owner has no duty to deliver his ship to the shipyard in a hazard free condition, when the requested repairs would remedy the hazards which cause the injury.
>
> . . .
>
> After *De Los Santos,* this Court has continued to recognize these principles in a shipyard situation.
>
> . . .
>
> Finally, [the vessel owner] has not transgressed the *De Los Santos* requirement that the shipowner intervene to protect a longshoreman when the vessel knows of an unsafe condition that the stevedore (or shipyard) is improvidently failing to guard the worker against. There is no evidence in the record that ACL had "actual knowledge" of the hazardous condition which arose.

There can be no other conclusion drawn from the evidence in this case but that the dangerous condition which caused the accident was the conducting of a hydrostatic test on the piping system of the OMI WABASH at the same time that repairs were being made by Mr. Kirby on the pipe being tested. The shipowner had no actual knowledge as to when the hydrostatic test would be conducted; it had no actual knowledge as to when the repairs were going to be made; and, therefore, it had no actual knowledge of the dangerous condition which caused Mr. Kirby's death.

An excellent discussion of what constitutes "actual knowledge" of the shipowner is found in the case of *Futo v Lykes Bros. S.S. Co., Inc.*, 742 F.2d 209 (5th Cir., 1984).

The point is made clear by the court in *Helaire* that the vessel owner can be held liable for injuries to employees of the shipyard "only in the event of actual knowledge of the danger *and* actual knowledge that he

**57**

cannot rely on the [shipyard] to remedy this situation." 709 F.2d 1038 and 1039. [Emphasis in original].

The most that can be said from the evidence in the present case is that the ship's port engineer had knowledge that repairs would be performed and that ultimately a hydrostatic test would be conducted, but the evidence is undisputed that the port engineer did not know *when* the repairs would be performed nor *when* the hydrostatic test would be conducted, and was not aware that they would be performed and conducted at the same time. The scheduling of the repairs and the hydrostatic test were entirely up to the shipyard. The Plaintiff in essence is arguing that the shipowner, based upon facts which it either knew or should have known, had a duty to anticipate the dangerous condition, i.e., that the repair would be performed and the hydrostatic test conducted at the same time. The court in *Helaire,* however, at page 1039 stated:

> [The vessel owner] is not held to a duty to discover the condition or to anticipate its danger.

There was nothing inherently dangerous about performing the repairs. The shipyard's coordinator emphatically stated that if he had known Mr. Kirby was performing the repair at the time the coordinator made the decision to start the hydrostatic test, he would not have started the test. While it was dangerous to perform the repairs at the same time the hydrostatic test was being conducted on the same line, the court in *Futo* stated at page 220:

> Knowledge that the condition of an object renders it dangerous *if* used in a particular way or under particular circumstances does not of itself necessarily evidence the requisite knowledge of actual danger.

Even if the shipowner had a duty to discover the dangerous condition which was being created by the shipyard (a duty which it did not have), the second requirement in *Scindia* and *Helaire* could never be met, since the shipowner could not know that the shipyard was not adequately protecting Mr. Kirby from a dangerous condition about which it had no knowledge in the first place. Thus, the Court concludes as a matter of law that the shipowner breached no duty that it owed to the plaintiff's decedent.

It is, therefore,

ORDERED AND ADJUDGED:

1. The Motion for Judgment in Accordance with Motion for Directed Verdict is granted, and judgment will be entered accordingly for the defendant, OMI Corp.

58

2. The Court reserves jurisdiction to enter an order taxing costs.

DONE and ORDERED in Chambers at Jacksonville, Duval County, Florida, this 1st day of March, 1989.

*Editor's Note:* The plaintiff has appealed the foregoing decision to the First District Court of Appeal.